**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **CITY OF PLAQUEMINE AND RISK MANAGEMENT, INC., individually** and on behalf of all those similarly situated, | ) )  ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION** |
| **TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC**, and **HCFS HEALTH CARE FINANCIAL SERVICES, LLC,** | ) ) ) ) ) | |
| Defendants. | ) ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff, City of Plaquemine, Louisiana, individually and along with its administrator Risk Management, Inc. ("RMI"), who is administrative service agent for the Louisiana Municipal Risk Management Agency ("LMRMA"), and duly authorized assignee to join the City of Plaquemine in pursuing this claim, files this putative class action complaint against Defendants Team Health Holdings, Inc. ("Team Health Holdings"), Ameriteam Services, LLC ("Ameriteam"), and HCFS Health Care Financial Services, LLC ("HCFS") (collectively "Defendants" or "TeamHealth"), and alleges and states as follows:

I.     <u>**NATURE OF THE ACTION**</u>.

1.     The City of Plaquemine is a municipality of the State of Louisiana and has municipal employees for which it self-insures for workers' compensation purposes.

2.     The LMRMA is a health care plan funded by Louisiana local government entities such as the City of Plaquemine. The LMRMA previously filed a complaint naming the same

Defendants on March 21, 2022 on behalf of six of its members, including the City of Plaquemine.[1] The Court dismissed the LMRMA's complaint without prejudice on grounds of lack of standing on November 18, 2022.[2]

3.     RMI has standing as the valid assignee of the claims of affected municipalities who are members of the LMRMA's self-funded plan (the "Plan") covering medical expenses of employees of municipal police departments, fire departments, ambulance, and other important local services. Affected municipalities who are members of the Plan have validly assigned their claims for the injury they have suffered because of TeamHealth's overcharges to the City of Plaquemine (through RMI), which acts generally as an administrative services agent for the Plan and LMRMA. Under the applicable law, the assignee has a right to sue, as does the City of Plaquemine.[3]

4.     During pertinent times, RMI employees were responsible for processing incoming claims and bills for payment received from at least two relevant TeamHealth affiliates discussed further hereinbelow, namely ACS Primary Care Physicians Louisiana PC ("ACS") and Van Meter Emergency Physicians Inc. ("Van Meter"). RMI and City of Plaquemine lost access to funds and the investment value of those funds when during the pertinent times, Defendants were unjustly enriched by those funds, which Defendants should not have held and which RMI and City of Plaquemine should have held.

---

[1] *Louisiana Municipal Risk Mgmt. Agency v. Team Health Holdings, Inc*., No. 3:22-CV-00104-DCLC-JEM (E.D. Tenn.).

[2] *Louisiana Municipal Risk Mgmt. Agency v. Team Health Holdings, Inc*., No. 3:22-CV-00104-DCLC-JEM, 2022 U.S. Dist. LEXIS 209567, 2022 WL 17086389 (E.D. Tenn. Nov. 18, 2022). The Court's Order reflects a finding that the member municipalities are the actual entities damaged. If so, that right can be assigned. *See Bishof v. Yarbrough Constr. Co.,* No. 02A01-9411-CH-00256, 1996 Tenn. App. LEXIS 544, *18-19, 1996 WL 490629 (Tenn. Ct. App. Aug. 29, 1996) (describing that an obligee has a right to assign a chose in action).

[3] *See Bishof v. Yarbrough Constr. Co.,* No. 02A01-9411-CH-00256, 1996 Tenn. App. LEXIS 544, *18-19, 1996 WL 490629 (Tenn. Ct. App. Aug. 29, 1996) (describing that the general rule is that the unqualified assignment of a right of action vests in the assignee the title thereto to the same extent as the assignor had it at the date of the assignment).

2

5.     After obtaining express assignments of claims from 5 of the 6 relevant municipalities, Plaintiff RMI refiled its lawsuit on December 20,2022.[4]

6.     RMI and City of Plaquemine now respectfully allege that they have an injury, a stake in the controversy, and standing to sue, on their own behalf and on behalf of LMRMA's members, arising out of the common law duty to make payments on duly supported incoming claims, and likewise, to seek to recoup overpayments made on claims that were induced by fraudulent, unfair, and deceptive conduct of Defendants and that Plaintiff would not have paid had the true facts been known.

7.     This overbilling was the fruit of a deliberate business model and carefully reticulated scheme.  The scheme makes the overbilling ordinarily undetectable because it is founded upon upcoding of "CPT codes" used to bill for services.  Consultation with medical professionals, data mining, and a CPT coding expert is necessary to uncover the fraud.  As alleged below, Plaintiff has retained such an expert herein as soon as it suspected a hidden scheme.

8.     Defendants intentionally made the fraud more difficult to discover by splitting up TeamHealth's numerous individual physicians and other medical providers staffing hospitals across the nation into hundreds of ostensibly separate and independent local practice entities.  Each of these local practice groups is seemingly disconnected from the others and they go by many different names, addresses, and provider identification numbers.  With regard to the City of Plaquemine, LMRMA, and RMI, the relevant local practice groups included ACS and Van Meter.  While the medical professionals with ACS and Van Meter provide the services, all the coding and billing for ACS and Van Meter, and the other local groups, is done by a single entity, believed to be HCFS.  Then, the bills for services rendered are sent under the local practice groups' names,

---

[4] *See Risk Management Inc. v. Team Health Holdings, Inc. et al*, No. 3:22-CV-00456-DCLC-DCP (E.D.Tenn.).

not the name of HCFS. This set-up disaggregates, fragments, and disguises the source of overbilling.

9. The important services provided by the individual healthcare providers and medical professionals, including physicians, nurse practitioners, physician assistants, and others are intended by those individuals to serve the public good, and those individuals are normally unaware of the coding and billing fraud. Nonetheless, the integrity of the coding and billing for services provided has been infiltrated and corrupted by the TeamHealth Enterprise specifically through its coding and billing entity, HCFS.

10. Stated differently, the TeamHealth ultimate parent entity, namely TeamHealth Holdings, claims that it does not interfere with the medical independence and discretion exercised by the physicians at ACS, Van Meter, or other local practice entities. Yet Defendants require that all these local entities direct their billing and coding through a single bottleneck, HCFS, which facilitates its false and fraudulent coding. Defendants know that by separating the coding and billing from the medical practices, they can keep the individual physicians and other medical professionals in the dark. And, they know that by sending out the bills under the names of the many seemingly small, independent providers, it becomes much more difficult to identify the overbilling as a common flaw, or trace it back to TeamHealth as a common source.

11.     It is now evident from multiple other lawsuits,[5] including three presently before this Court,[6] that Defendants, as jointly and severally liable persons, through their association-in-fact, and via the below-described Enterprise, systematically overbilled both governmental and private payors for years.  Defendants engaged in a pattern and practice of health care overbilling that has caused harm to the Medicare system, to self-insured entities, and to private insurance payors.  Accordingly, Plaintiff brings this action to recover recoupment and disgorgement of overpayments, including overpayments induced by fraudulent, unfair, and deceptive conduct of Defendants, and damages reflecting the wrongful medical overbilling by Defendants, and to seek injunctive relief, on behalf of itself and a putative class of others similarly situated.

12.     During the minimum four-year damages period applicable herein for the RICO counts, the three-year period for the unjust enrichment count,[7] and the potentially longer time for

---

[5] *See United States ex rel. Hernandez v. Team Fin., L.L.C*., No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, *31, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (denying motion to dismiss relator's complaint filed under the False Claims Act, 31 U.S.C. § 3729 *et seq*. alleging upcoding and overbilling fraud); *Celtic Ins. Co. v. Team Health Holdings, Inc*., No. 3:20-cv-00523-DCLC-HBG (E.D. Tenn.) (see Doc. 1, complaint filed Dec. 10, 2020 ¶¶ 8-17 alleging *inter alia* systematic upcoding/overbilling); *Emergency Care Servs. of Pennsylvania v. UnitedHealth Group*, No. 5:20-cv-5094 (E.D. Pa.), *see* ECF No. 37 (counterclaim alleging that TeamHealth engaged in upcoding of health insurance claims); *United Healthcare Servs., Inc. v. Team Health Holdings, Inc*., No. 3:21-cv-00364 (E.D. Tenn.) (same, primary claim); *United States ex rel. Oughatiyan v. IPC the Hospitalist Co., Inc*., No. 09-C-5418, 2015 U.S. Dist. LEXIS 19066, 2015 WL 718345 (N.D. Ill. Feb. 17, 2015) (denying in part motion to dismiss FCA claim for TeamHealth hospitalist overbilling); *U.S. ex rel. Mamalakis vs. Anesthetix Management LLC*, 2021 U.S. App. LEXIS 36193, 2021 WL 5818476 (Dec. 8, 2021) (involving TeamHealth anesthesiologist overbilling).
[6] *See Celtic Ins. Co., supra*; *United Healthcare Servs., Inc., supra*.
[7] For Counts One and Two, alleging claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, the statute of limitations is four years. *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 155-56 (1987); *Fraley v. Ohio Gallia County*, No. 97-3564, 1998 U.S. App. LEXIS 28078, *4 (6th Cir. Oct. 30, 1998); *Lehman v. Lucom*, 727 F.3d 1326, 1330-31 (11th Cir. 2013).  For Count Three, unjust enrichment, this Court has indicated that a three-year period applies.  *United HealthCare Servs., Inc. v. Team Health Holdings, Inc.,* No. 21-CV-364, 2022 U.S. Dist. LEXIS 84264, *15, 2022 WL 1481171 (E.D. Tenn. May 10, 2022) (three-year statute for unjust enrichment).  Further, Plaintiff alleges that tolling applies insofar as the Defendants made active efforts to conceal their misconduct. *See In re Estate of Davis,* 308 S.W.3d 832, 840-42 (Tenn. 2010); *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012).

claims for equitable, declaratory and injunctive relief,[8] in providing medical staffing to hospitals, TeamHealth has in particular focused on emergency department ("ED") staffing.

13.    TeamHealth promises hospitals, physicians, and ER staff that it will increase efficiency and profitability and lift the administrative burdens off practitioners' shoulders. However, once HCFS becomes involved to do the billing, Defendants use their intentionally obfuscated scheme[9] to obtain overpayments from payors.  Following uniform rules, policies, practices, and procedures, HCFS overbills by using improperly chosen Current Procedural Terminology ("CPT") codes[10] in conjunction with the billing.  RMI and class members rely on TeamHealth's representations in the form of the CPT code-based billing statements that Defendants transmit across state lines by mail or wire and that Defendants certify to be "true, accurate and complete."[11] In relying on Defendants' false representations and accepting claims for payment to their detriment, payors pay higher amounts than are properly due.

14.    As discussed below, medical professionals generally bill ED services using consecutively numbered CPT codes from 99281 to 99285.  Higher level codes indicate more extensive and complex treatment. Correspondingly, the higher the level of the code, the greater the payment.  Payors reimburse providers for higher CPT code services at a higher rate than for lower-coded services.  Defendants overbilled by using inflated CPT codes not appropriate to the level of

---

[8] *E.g., Murray v. Midland Funding, LLC,* 233 Md. App. 254, 163 A.3d 271, 2017 Md. App. LEXIS 676, 2017 WL 2806767 (Md. Ct. App. June 29, 2017) (discussing that "[a]ll claims for purely equitable remedies, including claims for injunctive relief, are potentially subject to laches" but claim for declaratory judgment may have no time-bar).

[9] *See Hernandez,* 2020 U.S. Dist. LEXIS 26608, *4-12 (summarizing analogous scheme); *Celtic Ins. Co.,* ECF No. 1, complaint filed Dec. 10, 2020, ¶¶ 8-17 (same).

[10] "CPT codes are developed, maintained, and copyrighted by the American Medical Association to help ensure uniformity among medical professionals and the health insurance industry. CPT codes consist of a group of numbers assigned to every task and service a medical practitioner may provide to a patient, including medical, surgical, and diagnostic services." *Witkin v. Bureau of Workers' Comp. Fee Review Hearing Office (State Workers' Ins. Fund)*, 67 A.3d 98, 99 n.4 (Pa. Commonwealth Ct. 2013).

[11] CMS Form 1500, see preprinted statements on reverse side of the hardcopy version.  The electronic version is deemed to include the same.

care provided or required. Defendants systematically engaged in upcoding, that is, specifying a higher code than was appropriate, and submitted fraudulent billing to RMI and numerous other payors.

15. During the pertinent times, administrators of self-funded plans, like insurers for fully funded plans, used similar rules to determine amounts to pay based on the CPT codes also used by the Centers for Medicare and Medicaid Services ("CMS") to pay under the Medicare program. TeamHealth's scheme violated the CMS rules and those used by private payors alike.

16. TeamHealth advertises that HCFS coders work under rigorous standards, deliver impeccable service, and are routinely audited. TeamHealth represents to the public that it carefully calibrates its compliance criteria, and that medical professions and payors alike can trust the work performed by its coders. These representations are false.

17. TeamHealth perpetrated its schemes for the purpose of generating additional profit. The scheme defrauded the City of Plaquemine, RMI, the LMRMA plan, and those similarly situated cumulatively out of tens of millions of dollars over any applicable statute of limitations period. For purposes of a declaratory judgment and ordering a disgorgement remedy, in addition, the Court may only be subject to the time horizon interposed by an equitable "laches" defense, which here does not exist.

## II. PARTIES.

### A. Plaintiff.

18. Plaintiff City of Plaquemine is an incorporated Louisiana municipality as defined in Title 33, and as such has the right to sue, and its agent RMI is an entity organized, existing and licensed under Louisiana law and has an office address of 6767 Perkins Road, Baton Rouge, LA 70808.

19.     Nonparty LMRMA is an entity organized, existing, and licensed under Louisiana law and has an office address of 6767 Perkins Road, Baton Rouge, LA 70808.   LMRMA is an interlocal risk management agency created pursuant to La. Rev. Stat. § 33:1341 *et seq*., with authority over a group self-insurance fund (here, the Plan) formed from contributions of its members (including the City of Plaquemine) to pool together workers' compensation risks for the public municipal benefit and good, providing important workers' compensation benefits to numerous eligible workers and enrollees such as police officers and first responders as well as other municipal employees.

20.     The Plan is assisted regarding certain services and functions by RMI.  RMI acts as a service organization for the LMRMA and City of Plaquemine, including administrative work pertaining to one or more workers' compensation and liability self-insured funds.

21.     Each exemplar claim alleged herein was received by and approved by LMRMA or by RMI, who reasonably and justifiably relied on Defendants' claim form submission information provided across state lines and by wire or mail by a related TeamHealth entity.

22.     During the pertinent times, Plaintiff or LMRMA reviewed the incoming claims received, and approved each claim in the referenced amount using the relevant State workers' compensation schedule to reduce the charge to the corresponding payment amount.

23.     Each exemplar claim at issue was received by mail, in addition to any other method in which they may have been received, by RMI as the relevant agent for LMRMA and the City of Plaquemine.  Plaintiff and LMRMA specifically relied on the CPT codes provided in the relevant claim submissions in determining payment on the claim.

24.     City of Plaquemine and RMI have standing to sue to recoup the overpayment, both as an implicit right and duty in connection with its claims administration services, and, as a matter of express written assignment of claims and relevant choses in action.

25.     The LMRMA was formed under Louisiana Act No. 462 of 1979 to provide a program of workers' compensation, accident and health, and public liability coverage for its member organizations. In accordance with Revised Statutes 33:1341-1350, all local government subdivisions in the state of Louisiana are eligible to participate. The LMRMA Workers' Compensation Fund's general objectives are to formulate, develop, and administer, on behalf of the member local governmental subdivisions, a program of interlocal risk management, to obtain lower costs for that coverage, and to develop a comprehensive loss control program. Local governmental subdivisions joining the fund must be members of the Louisiana Municipal Association; a member may withdraw from the fund by giving proper notice. City of Plaquemine appears herein along with RMI, to whom it assigned the right to join in this litigation to pursue jointly the action arising out of the overpayments to TeamHealth described herein.

26.     RMI also has standing to sue in its capacity as administrator or service assistance vendor for the Plan.  RMI's reasonable, normal clerical duties included receiving, reviewing, and paying incoming bills on behalf of member municipalities.  Said members inherently and implicitly consented to and authorized the entity performing said clerical duties to seek to recover, *inter alia*, recoupment of a mistaken overpayment procured by fraud.

**B.     <u>Defendants</u>.**

27.     Defendant Team Health Holdings is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. For jurisdictional purposes it is a citizen of Delaware and Tennessee.  It may be served with process at

9

its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312. Team Health Holdings is the ultimate parent company for the TeamHealth organization. Upon information and belief, Team Health Holdings was directly involved in promulgating and implementing the unlawful policies and practices alleged herein, and/or, is otherwise directly legally responsible for the conduct alleged herein, in addition to the responsibility shared by any other named Defendant.

28. Defendant Ameriteam is a Tennessee limited liability company. Its sole member is Team Finance LLC, whose sole member is Team Health Holdings. On information and belief, Ameriteam employs executive officers of TeamHealth, issues policies that govern all TeamHealth entities in conjunction with its ultimate parent, Team Health Holdings, and provides operational direction and administrative support to TeamHealth entities. Its principal place of business is at the 265 Brookview Centre Way address. Ameriteam is a citizen of Delaware and Tennessee. It may be served with process at its corporate office address or c/o its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

29. Defendant HCFS is a Florida limited liability company with a principal office situated in Knoxville, Tennessee. It may be served at its principal office address at 265 Brookview Centre Way, Suite 400, ATTN: Legal Dept., Knoxville, TN 37919-4049; or via its registered agent, Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh NC 27608. On information and belief, the sole member of HCFS is Team Radiology, LLC, the sole member of Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings. HCFS provides billing, coding, and collection services for the TeamHealth enterprise, as well as for others.

30.     Nonparty ACS is a business entity on information and belief formed and organized under Louisiana law. It is an emergency medicine provider. Its NPI Number is 1306889092. It has an office address at 211 4th Street, Alexandria, LA 71301 and an office address at PO Box 634703, Cincinnati, OH 45263. Its provider tax ID number is 62-1859672. This entity is ultimately owned by Team Health Holdings, Inc.

31.     ACS is one of hundreds of local practice entities that are nominally separate and independent from TeamHealth.[12]  On information and belief, as a P.A., ACS has several individual members or owners.  This is because a medical professional association or similar practice group entity must be owned by one or more licensed physicians to comply with state "corporate practice of medicine" laws.  In its business model, TeamHealth in the normal course of business ensures that at least one of the individual physicians listed as owning the P.A. is also employed by another TeamHealth entity.  In this way, TeamHealth seeks to sidestep "corporate practice of medicine" laws and retain relevant control.

32.     Nonparty Van Meter is a business entity on information and belief formed and organized under Louisiana law. It is an emergency medicine provider. Its NPI Number is 1649410697. It has an office address at 1816 Industrial Boulevard, Harvey, LA 70058 and/or at PO Box 636343, Cincinnati OH 45263. Van Meter is owned and controlled by Team Health Holdings.  Van Meter is one of the TeamHealth local practice entities that submitted claims for reimbursement to the LMRMA for ED services rendered by TeamHealth professionals.

33.     Under TeamHealth's model, a single physician may be designated to be a listed member of, and to "own", up to many P.A.s/practice groups in a single State.  There will be form

---

[12] See Celtic Ins. Co., Doc. 28, p. 18 (opposition to motion to dismiss RICO claim, noting that some of the 100-plus entities including one or more "ACS" entities are only partially owned by TeamHealth, or, are "wholly owned by others") (citing Doc. 1, Celtic Ins. Co. complaint ¶ 100 (alleging same).

agreements issued, including a management services agreement between the P.A. and another entity owned by TeamHealth; an employment agreement between each physician and the P.A.; and a shareholder/buyout agreement where TeamHealth is taking over an existing practice.

34. TeamHealth itself is owned by a large private equity firm, Blackstone, which acquired the Enterprise in 2017 for $6.1 billion. TeamHealth among other things provides ED staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and nominally independent entities and contractors, which operate in nearly all states and which Defendants refer to collectively as the "TeamHealth System."

35. TeamHealth designed the complex structure of the TeamHealth System to circumvent state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, or splitting professional fees with doctors, aka, the corporate practice of medicine.

36. TeamHealth deploys numerous local subsidiaries and affiliates with varying names intentionally to efface its own involvement in the relevant practices, as further discussed below.

## III.   JURISDICTION AND VENUE.

37. This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy for the Plaintiff exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1332(d) of the Class Action Fairness Act, because this is a class action in which at least one Plaintiff or class member is a citizen of a different State than at least one Defendant and the class-wide amount in controversy is over $5,000,000.

38. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under federal law, and under 18 U.S.C. § 1964(c) in that this action alleges

violations of RICO. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

39.     This Court has personal jurisdiction over Defendants because they were located in or conducted relevant business activities in the State of Tennessee during the pertinent times or otherwise had such minimum contacts with the forum as to make it fair and reasonable for them to be hauled into Court here. All named Defendants are also believed to do business specifically in Tennessee by staffing EDs in towns including Union City, Tazewell, Sevierville, Livingston, Carthage, Winchester, Pulaski, Lawrenceburg, and Athens, Tennessee.

40.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to this Complaint occurred in this District; and because the Defendants transact business in this District, including doing business with EDs and hospitals in this District, and engaging in relevant coding and billing activities here.

## IV.     DETAILED FACTS.

### a.     Background on TeamHealth.

41.     TeamHealth entered arrangements with numerous hospitals to replace local ED practice groups with TeamHealth's outsourced staff and attendant administrative, operational, coding, and billing infrastructure. TeamHealth staffs those emergency departments with ED physicians, midlevel practitioners, and other staff under contract (directly or indirectly) with TeamHealth, and TeamHealth bills payors for the services these staffers provide.

42.     Midlevel practitioners, also called non-physician practitioners, advanced practice clinicians ("APCs"), or advanced clinical practitioners ("ACPs") are health care workers who have a defined scope of practice. They pertinently can include physician assistants ("PAs") and nurse

practitioners ("NPs"). Midlevels have training less than a physician but greater than a nurse or medical assistant.

43.     TeamHealth organizes groups of local personnel to staff hospitals using locally formed business entities such as ACS and Van Meter.  These local, small entities are reflected on paper as the employer of (or contractor for) the TeamHealth-supplied ED staff at hospitals visited by enrollees of the LMRMA Plan and the City of Plaquemine.

44.     After TeamHealth's healthcare contractors provide a service to a patient, an administrative group (believed to be HCFS) at or overseen by TeamHealth's centralized corporate offices creates a health insurance claim by converting the medical record of TeamHealth's healthcare contractors into a health insurance claim. TeamHealth sends the claim to applicable payors including insurers, third-party administrators ("TPAs") of self-funded plans, service organizations assisting plans (such as RMI herein), CMS, or directly to the patient.

45.     Here, for the specific false claims and overbilling applicable to the LMRMA and the City of Plaquemine, the applicable local entities included (potentially among others), ACS and Van Meter.  With regard to the ACS and Van Meter claims, the TeamHealth staffers consisted of physicians, midlevels, and others who were assigned to work in the emergency department of Rapides Regional Medical Center, located at 211 4th Street, Alexandria, LA 71301, or at Our Lady of the Angels Hospital, 433 Plaza Street, Bogalusa, LA 70427.

46.     The ED staff who treat the patient do not see the insurance claims that TeamHealth creates, even though the claims are submitted in their names.  Nor do they receive the money that TeamHealth collects.  Rather, TeamHealth has the money sent directly to TeamHealth. Generally, TeamHealth pays doctors and physician's assistants/midlevels a fixed hourly or per patient or per

transaction fee. Using this scheme, TeamHealth keeps most of the money that its doctors and midlevels generate.

47.     Medical coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. Billing codes are used by CMS and private payors to pay for services. Standardized health care billing codes are called CPT codes. HCFS determines what CPT codes to bill and sends claims containing these codes to payors when TeamHealth seeks payment for services.

48.     A central administrative group at TeamHealth's corporate offices in Tennessee handles the coding. The coders take the medical records generated by TeamHealth's healthcare staffers and decide what CPT code to bill for the work performed. After reviewing the medical record generated by the TeamHealth medical team staffing the hospital ED in question, a coder assigns the CPT codes. HCFS then submits the codes as a claim, however, using the name of the relevant local physician group.

49.     The coders are administrative employees hired and trained by TeamHealth. They are not ED physicians, and they usually lack medical training. TeamHealth's doctors and midlevels do not see the codes selected by these coders, nor do those front-line workers see the insurance claims or billed amounts. The providers are not consulted regarding what codes should be billed.

50.     In the normal course of billing and payment, payors often do not see the medical records generated by TeamHealth's staff, or, if medical records are sent, do not review those records using a coding expert who would have the capacity to uncover the fraud. Payors typically accept the CPT codes as submitted and calibrate payments accordingly in an automated or administrative process, with no independent judgment exercised by a CPT coding expert regarding

whether the facially proper[13] CPT code is in fact inflated. This information asymmetry is ripe for fraud, and TeamHealth exploited it.

51.    After TeamHealth convinces a hospital to "outsource" its ED to TeamHealth, TeamHealth acts as an intermediary or gatekeeper between its own (directly or indirectly employed or contracted) healthcare workers, and the Medicare authorities, insurance companies, and plans that pay for their services. By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare staff, but without oversight.

52.    TeamHealth's business model of being an intermediary between doctors and insurance companies causes doctors to be paid less. TeamHealth requires that all payments be sent directly to its corporate enterprise and keeps most of the payments.

53.    TeamHealth's individual healthcare contractors and employees have no say in how the medical records that they generate are translated into CPT codes and bills.

54.    TeamHealth has grown dramatically by acquiring other staffing/billing companies focused on ED services and other sectors. It has become one of the largest suppliers of outsourced healthcare staffing and administrative services for hospitals and other healthcare providers in the United States. TeamHealth operates nationwide, claiming to control hospital EDs in 47 states, and employs more than 18,000 individuals.

55.    Historically, many or most hospital EDs have operated at a loss. However, TeamHealth's business model has generated significant profits.

56.    When sending bills or providing services, TeamHealth usually does not use its own name or provider identification number (PIN). Instead, it uses the names and PINs of its doctors

---

[13] The CPT codes used by TeamHealth superficially appear to be facially proper, in the sense that there is a small group of CPT codes used for emergency services, and the codes selected by TeamHealth for its billing fall into that group. However, TeamHealth coders routinely select the wrong, inflated code out of that available code set.

or one of the 100-plus[14] entities who are the local affiliates and do not carry the TeamHealth name. Because TeamHealth uses many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its Enterprise and the sheer number of times it has carried out this scheme.

57.     TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine. The corporate practice of medicine doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services. This rule promotes doctors working for themselves or with other doctors. It is intended to safeguard against the commercialization of the practice of medicine, which risks putting financial incentives above patient care.

58.     TeamHealth seeks to circumvent state laws banning the corporate practice of medicine by creating or acquiring and maintaining a large number of these local entity practices. TeamHealth owns and operates many regional corporations, which in turn own these subsidiaries or employ individual physicians who are used to control the local practice entities that employ physicians as purported independent contractors. TeamHealth, the corporation, thus avoids directly employing the doctors it controls.

59.     Through HCFS, TeamHealth handles all the medical coding and billing for work performed by its staffers around the country and uses uniform procedures across the Enterprise designed to maximize revenue. It centrally controls its workforce nationwide by setting procedures for their work, when and how much they work, and what they are paid.  On information and belief, Ameriteam assists in creating these policies.  TeamHealth decides what codes to assign and how

---

[14] *See Celtic Ins. Co*., Doc. 1, complaint ¶ 100 ("over 100 separate entities"), *and see* complaint Ex. 4, Doc. 1-4 (listing 133 entities).  Interestingly, the list filed by Celtic Insurance does not include the local entity herein, namely ACS Primary Care Physicians Louisiana PC.  However, Celtic does list three other ACS entities.  *See id*., items 3-5 in the list.  Thus, the true number of these local entities may be even higher than Celtic lists.

much to bill for its personnel's services. When local medical staff complete their work with a patient, they submit medical records to HCFS. HCFS then engages in upcoding, overbilling, and aggressively collecting those bills.

60. One of TeamHealth's healthcare workers described the situation: "As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my name. I have no idea what is collected in my name. This is not what I signed up for and this isn't what most other ER docs signed up for. I went into medicine to lessen suffering, but as I understand more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[15]

61. When seeking payment for services, TeamHealth makes a representation that the CPT codes accurately describe the service provided by the TeamHealth unit at the hospital ED in question. When TeamHealth does not include medical records showing what services were provided, a payor cannot compare the codes on the claims to documentation regarding the services. When TeamHealth does include the medical records, this is still insufficient to let personnel at the payor end do more than catch facial errors. That is because deconstructing a CPT code after the fact to see if it was accurate and supported by the medical records requires special skills and efficiencies that TeamHealth inhibits and makes cost prohibitive with its scheme. Because of the large volume of claims submitted and the laws prohibiting health insurance fraud, payors reasonably rely on TeamHealth's representations.

62. TeamHealth relies on a simple calculus: that the effort it takes (one must hire a coding expert to do it) to manually go through the claims for payment and weed out the 60% or

---

[15] *See* Isaac Arnsdorf, "How Rich Investors, Not Doctors, Profit From Marking Up ER Bills," ProPublica, June 12, 2020, https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed March 16, 2022).

more[16] with overbilling via inflated CPT codes is inefficient if not cost-prohibitive as a process of identifying and rectifying individual cases of the overbilling. However, one or more large insurance company payors have used their large cohort of claims to engage in statistical analysis and determine the systematic nature of the overbilling.[17] And` the federal government has performed a similar analysis of Medicare claims affected by analogous fraud.[18]

63. TeamHealth is able to conceal false information in its health insurance claims because (a) the healthcare staffer who provided the service does not see the health insurance claims that TeamHealth submits, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits, and (c) TeamHealth may not provide complete records to payors. TeamHealth abuses this information asymmetry to perpetrate the fraud.

64. Making matters worse, when HCFS codes and prepares a bill, it typically bills for the whole charge that would be applicable were there no rate schedules or other reductions involved. HCFS leaves it to the payor to determine how much the bill should be reduced to comply with the actual rates that apply – even aside from the CPT code fraud. In the instant matter, for example, with regard to the LMRMA and RMI, the relevant sample of bills discussed below all related to claims that were subject to payment based on the Louisiana workers' compensation rate schedule promulgated by the Louisiana Workforce Commission, Office of Workers' Compensation. In relevant part that current payment schedule provides:

---

[16] Compare the *United Healthcare* case, in which the plaintiff alleged 60% of one set of examined claims were overbilled. *See United Healthcare* complaint ¶ 8 ("The United Plaintiffs have reviewed tens of thousands of commercial health benefits claims submitted by TeamHealth and have determined that well over half of the claims TeamHealth submitted to United using the two highest level CPT codes for ER visits—roughly 60%—should have utilized lower-level CPT codes."). In *Celtic*, the expressed percentage for a sample set was nearly two-thirds. *Celtic Ins. Co*., Complaint ¶ 12 ("[O]ne of Celtic's affiliates recently received and reviewed more than 10,000 of TeamHealth's medical records associated with health insurance claims that TeamHealth billed at the highest ER medical billing codes. Celtic's affiliate concluded that TeamHealth had 'upcoded' nearly two-thirds of the health insurance claims associated with those 10,000-plus medical records.").

[17] *Celtic Ins. Co*., *supra*; *United Healthcare*; *supra*.

[18] *Hernandez, supra.*

| | | | | |
|---|---|---|---|---|
| 99281 | | Emergency dept visit | | $40 |
| 99282 | | Emergency dept visit | | $63 |
| 99283 | | Emergency dept visit | | $114 |
| 99284 | | Emergency dept visit | | $173 |
| 99285 | | Emergency dept visit.. | | $296 |

65.     Here, the five CPT codes are identified in the left-most column, as can be seen, in ascending order from 99281 to 99285.  The authorized payment for CPT code 99281 is $40.  The authorized payment for CPT code 99285 is $296.  Thus, by simply inflating the CPT code from 99284 to 99285, the payment goes up from $173 to $296.  TeamHealth not only inflates the CPT code routinely, but also, in its bill, charges the full amount it could recover only if the workers' compensation schedule did not apply – an amount that can be multiple times higher than what the schedule allows.  TeamHealth leaves it to the payor to reduce the charge down to what the schedule says.  There is no reason why an entity as sophisticated as HCFS could not simply bill the appropriate charge based on the publicly available schedule in the first instance, but that is not what occurs.  This use of charges that will obviously have to be reduced imposes another layer of work upon the payor and the TPA or service organization assisting and serves to further disguise the fact of the overbilling.  Even once the facially excessive charge is reduced down to the appropriate CPT code amount per the schedule, the hidden fraud caused by the inflated CPT code itself will still remain and result in an overpayment.

66.     Every time TeamHealth submitted a health insurance claim to RMI as the administrative service agent for the LMRMA plan and City of Plaquemine, it certified that the information was true, accurate, and complete and that the services listed were medically indicated and necessary to the health of the patient and were personally furnished. However, due to the improper scheme, often these certifications were false.

20

67.     Ultimately, TeamHealth's billing schemes have harmed not only the subject plan and plans generally but also, patients. Inflated health insurance claims increase cost-sharing obligations and drive up the cost of health care. TeamHealth's improper practices have not only increased costs for patients but have also put upward pressure on premiums that cause the federal and state governments to spend more on cost-sharing subsidies and other taxpayer-funded support.

**b.      Further detail regarding TeamHealth's scheme – specific examples.**

68.     During the relevant times, the City of Plaquemine's LMRMA's enrollees in the self-funded plan have received ED medical care from one or more TeamHealth-supplied staff. Based on that care, TeamHealth submitted health insurance claims that the plan paid in reliance on the medical billing codes submitted by TeamHealth.  However, as Plaintiff has now confirmed with an expert, TeamHealth falsely inflated the medical billing codes on insurance claims that it submitted.

69.     TeamHealth's upcoded health insurance claims caused the plan to overpay TeamHealth for services performed by its doctors and physician's assistants or other midlevel providers. By upcoding, TeamHealth submitted fraudulent insurance claims, resulting in overpayments by the LMRMA plan (and the City of Plaquemine) that TeamHealth secured through fraud and through its Enterprise consisting of a carefully constructed enterprise operating across state lines.

70.     Like Medicaid and Medicare, private health insurance companies and TPA-administered self-funded plans pay less for services provided where the level of service only warrants a lower versus a higher CPT code.

71.     During the same time that TeamHealth sent bills with inflated CPT codes that resulted in the plan paying TeamHealth, TeamHealth was also sending similar bills with similar

inflated codes to other plans and payors. TeamHealth's improper overbilling practices were discovered by one or more insurance companies and complained of in litigation. *See* Complaint filed on December 10, 2020 in *Celtic Ins. Co.*, *supra* (alleging *inter alia* systematic upcoding/overbilling; matter was later resolved); Complaint filed on October 27, 2021 in *United Healthcare Services, Inc.*, *supra* (same, claim remains pending).

72.     The plaintiff in *Celtic Ins. Co.* alleged with factual specificity similar unlawful CPT upcoding during an overlapping time period. *See Celtic Ins. Co*., Complaint, Doc. 1, ¶¶ 1 (alleging that "[i]n the past seven years, TeamHealth billed over $100,000,000 in fraudulent health insurance claims to Affordable Care Act health insurance plans run by Celtic. TeamHealth perpetrated this billing fraud by 'upcoding' tens of thousands of health insurance claims, then submitting the upcoded claims to Celtic under the names of thousands of unsuspecting doctors who work for TeamHealth"), 8-15 (alleging overbilling based on CT codes), 50-78 (same, with further detail), 90-117 (RICO claim).

73.     Celtic alleged that TeamHealth systematically upcoded health insurance claims with higher and more expensive CPT codes. Celtic determined that TeamHealth billed routine services that TeamHealth's healthcare contractors provided, at the highest medical billing codes, even when the patients required only straightforward and minimal treatment. For example, patients complaining of headaches, fevers, bug bites, and other relatively minor symptoms were upcoded resulting in health insurance claims billed at the most expensive billing codes.

74.     Likewise, the plaintiff in *United Healthcare Servs., Inc.* alleged with specificity similar unlawful CPT upcoding during an overlapping time period. *See United Healthcare Servs., Inc.,* Complaint, Doc. 1, ¶¶ 1 ("Since at least 2016, TeamHealth has covertly and methodically engaged in a classic form of healthcare fraud called upcoding. Upcoding occurs when a healthcare

provider submits a claim to an insurer or claim administrator utilizing a Current Procedural Terminology (CPT) code that misrepresents the services provided, thus using the code to deceive the insurer or claim administrator into overpaying. Here, TeamHealth has deliberately upcoded tens, if not hundreds, of thousands of claims to the United Plaintiffs for emergency room services, resulting in the United Plaintiffs overpaying TeamHealth by more than one hundred million dollars."), 55-72 (upcoding allegations, including discussion of CPT codes), 73-87 (alleging 13 specific examples of CPT upcoding), 211-227 (RICO claim).

75.    In the instant case, and the case involving the other assignors to RMI and LMRMA during the pertinent times, by making similar misrepresentations, TeamHealth submitted insurance claims resulting in overpayments by the LMRMA plan and its member municipalities.  As a result of TeamHealth's upcoding, they paid TeamHealth more than was warranted on claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, they would have paid less.

76.    Likewise, TeamHealth was sued for an analogous practice of upcoding standard ED services to "critical care" billing codes in a *qui tam* case; *see* Second Amended Complaint filed on September 19, 2019, at Doc. 83 in *Hernandez, supra*.  The relator whistleblowers alleged internal emails and presentations by TeamHealth executives encouraging employees to bill for critical care codes, as opposed to lower codes.  In truth, few situations meet the CMS definition for "critical care," and CMS requires individualized assessment of each presenting condition to see whether it fulfills the criteria.

77.    That court denied a motion to dismiss.  *Hernandez*, 2020 U.S. Dist. LEXIS 26608, *9, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (describing the complaint allegations of "a classic upcoding scheme. Under the Critical Care Scheme, TeamHealth bills CMS for 'critical care'—the

23

highest level of emergency treatment reserved for life-threatening situations—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing.").  On June 25, 2021, the case was dismissed pursuant to an FCA settlement agreement.  Docs. 438, 439.[19]

78.    Per the insider documents, upper management at TeamHealth imposed quotas with respect to claims utilizing CPT codes 99291 and 99292—codes that denote increments of time spent rendering "critical care" to "critically ill or critically injured" patients.  These codes, along with the codes 99281 through 99285 at issue herein, make up the universe of ED billing codes. The relator alleged that TeamHealth's policies required physicians to certify that treatment rendered met the criteria for CPT codes 99291 and 99292, which are only appropriate in extreme circumstances, with respect to at least 6% of patients.  The complaint stated further: "TeamHealth instructs its coders and billers (who follow those instructions) to code and submit claims to CMS for payment for critical care services based on medical records and documentation that TeamHealth knows do not establish that the services provided met CMS' criteria and payment conditions for 'critical care' services and, therefore, do not support claiming reimbursement for such services at CMS' elevated rate of reimbursement for true critical care services."  *See Hernandez* Complaint, Doc. 1, ¶¶ 95-98, so alleging with citations.

79.    TeamHealth's inflated coding profits from the changing context of hospital ED care.  Increasingly, many Americans use hospital EDs to address numerous concerns that do not

_____

[19] Unusually for an FCA settlement, the settlement was filed without disclosure of the actual settlement amount, although it is clear an amount was paid.  *See* Doc. 438 in *Hernandez*, styled as a "Joint Notice of Payment and Motion for Dismissal," in which the parties recited that "Defendants stipulated that they would make the payments required by the Settlement Agreement on or before June 28, 2021. The purpose of this notice is to inform the Court that Defendants have completed the required payments…."  Subsequently, an intervenor moving for the unsealing of various materials noted that "TeamHealth paid a total of $48 million to the United States and Relators" but "did not, however, agree to change its practices."  Doc. 442, p. 6.

present emergent situations. Based on surveys, patient volume in EDs has been growing faster than the population for decades. In 1997, annual visits to the ED totaled 94.9 million (35.6 per 100 people). By 2006, that total had increased 26 percent overall to 119.2 million, or 14 percent when adjusting for population growth (40.5 per 100 people). Then by 2015, ED visits had reached 136.9 million, or 43.3 per 100 people—a 7 percent increase from 2006 on a per capita basis.[20]

80.     Furthermore, of those visits, a significant percentage involve a need for only "semiurgent" or "nonurgent" care. Of all ED visits, upwards of 30% or more do not involve immediate or emergent circumstances.[21] That reality gives TeamHealth ample opportunity to upcode and get paid as if most of its patients have life-threatening emergencies when in fact they often need only more routine medical services.

81.     As a result of TeamHealth's upcoding, the LMRMA plan paid TeamHealth more than was warranted on claims for the City of Plaquemine. Had TeamHealth assigned billing codes that accurately reflected the services provided, the plan and class members would have paid less.

82.     LMRMA and RMI performed a search of their records to seek to locate examples of TeamHealth bills received within recent years for the City of Plaquemine. RMI located the following instances in which the following criteria were met by a submitted claim for the City of Plaquemine and other members of LMRMA:

    a.  The claim was billed to LMRMA/RMI;

    b.  The billing provider was identified to be a local TeamHealth entity (in this case, ACS, which held the contract to provide ED staffing at Rapides Regional Medical Center, located in Alexandria, LA, and Van Meter, which provided ED staffing at Our Lady of the Angels Hospital, in Bogulosa, LA);

---

[20] *See* Tara O'Neill Hayes, Primer: Examining trends in emergency department utilization and costs, Nov. 1, 2018, available at https://www.americanactionforum.org (last accessed March 16, 2022) (citing sources).
[21] *See id.*

c.  The billing code was one of the standard CPT codes available in the case of ED services (as opposed to other kinds of care) (the applicable codes are 99281, 99282, 99283, 99284, 99285, 99291 and 99292); and

d.  TeamHealth provided a copy of the medical chart with the claim. (For the LMRMA, TeamHealth provided copies of charts because LMRMA required submission of copies of charts with claims related to workers compensation).

83.    The facts for these specific examples reflect that in the following claims, there was overbilling in the CPT coding.  As to each relevant claim itemized below, Defendants acted deliberately and with intent to defraud, and, with regard to each, Plaintiff has had the relevant file reviewed by a qualified medical coding expert.  The expert determined that the proper CPT code for the claim in the indicated instances should have been lower.  Defendants used the inflated CPT code to justify the charge. As to each relevant example, the amount that was subsequently paid was improperly increased as a result.  In each instance, Defendants caused fraudulent billing statements to be directed to the LMRMA and RMI, by mail, across state lines.  In each instance, the unlawful coding was performed by employees believed to be associated with the HCFS entity; and TeamHealth sent across state lines CPT codes embedded in the generic CMS-1500 forms sent to the LMRMA and its agent RMI.

84.    As to each of the claims listed below, the facts involved a covered and LMRMA Plan-enrolled individual who was employed as a police officer or in another public service capacity and was accordingly enrolled in this plan for workers' compensation medical benefits.  In each claim, the amount that the LMRMA Plan paid was set based on the plan and RMI relying on the CPT code provided in the claim.  The LMRMA Plan/RMI set a higher payment for a higher CPT code, and a lower payment for a lower CPT code.  For each relevant example, using the applicable workers' compensation benefit schedule, the LMRMA Plan/RMI set a payment amount that was

lower than the demanded charge, but was higher than it would have been had the appropriate CPT

code been used:

> a. **Claim No. 1: Rapides Regional Hospital/ACS ED Chart No. 2019W0007. Date of Service: January 23, 2019.** Defendants' HCFS coders intentionally and fraudulently selected the improper CPT code of 99284. In fact, the claim should have only been coded at 99282. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,565.00 for the emergency department visit. On information and belief, HCFS was well aware from past experience that this charge amount would have to be reduced to match the applicable Louisiana workers' compensation payment schedule. Relying on this fraudulent representation, the LMRMA Plan and RMI agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. The plan in fact paid that amount. If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount of $63.00. Defendants thereby used a CPT code which, because it was relied on and accepted, resulted in a payment over 2.7 times greater than it should have been. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio. The claim form was mailed to RMI, PO Box 14177, Baton Rouge LA 70898. The claim form was mailed across state lines and constituted mail fraud under 18 U.S.C. § 1341, which is a predicate offense under RICO.

> b. **Claim No. 2: No. 2020W0030. Date of Service: March 16, 2020.** HCFS fraudulently improperly coded this claim using CPT code 99284. In fact, the claim should have been coded using CPT code 99283. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,643.00 for the emergency department visit. Relying on this fraudulent representation, RMI and the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule. The plan in fact paid that amount. If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

> c. **Claim No. 3: No. 2021W0084. Date of Service: February 16, 2021.** HCFS fraudulently improperly coded this claim using CPT code 99284. In fact, the appropriate CPT code was 99283. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,643.00 for the emergency department visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. The plan in fact paid that amount. If the proper CPT code

have been submitted in the claim, then the plan would have paid a lower amount. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

d. **Claim No. 4**:  **No. 2018W0103.  Date of Service:  June 15, 2018.** HCFS fraudulently and improperly coded this claim using CPT code 99284.  The appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was three levels above what it should have been. Based on its fraudulent misrepresentation, HCFS demanded payment of $1,490.00.  Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits.  The plan in fact paid that amount.  If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount.  The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

e. **Claim No. 5**:  **No. 2019W0144.  Date of Service: October 28, 2020.**  HCFS improperly coded this claim using CPT code 99284.  The proper CPT code for this claim was 99281. HCFS therefore submitted a CPT code that was three levels above what it should have been.  Based on the inflated CPT code, HCFS demanded payment of $1,643.00 for the emergency department visit.  Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits.  The plan in fact paid that amount.  If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount.  The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

f. **Claim No. 6**:  **No. 2020W0010.  Date of Service:  February 15, 2020.** HCFS improperly coded this claim using CPT code 99284.  The proper CPT code for this claim was 99283.  HCFS therefore submitted a CPT code that was one level above what it should have been.   Based on the inflated CPT code, HCFS demanded payment of $1,643.00 for the emergency department visit.  Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits.  The plan in fact paid that amount.  If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount.  The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

g. **Claim No. 7**:  **No. 2019W0219.  Date of Service:  August 22, 2019.**  improperly coded this claim using CPT code 99285.  The proper CPT code that should have been submitted was 99283.  HCFS therefore submitted a CPT code that was two levels above what it should have been.  Based on the inflated CPT code, HCFS demanded payment of $2,331.00 for the emergency department visit.  Relying on

this fraudulent representation, the plan agreed that $296.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. The plan in fact paid that amount. If the proper CPT code have been submitted in the claim, then the plan would have paid a lower amount. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

h. **Claim No. 8: No. 2019W0069. Date of Service: May 15, 2019.** HCFS fraudulently and improperly coded this claim using CPT code 99285. In fact, the appropriate CPT code was 99284. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $2,331.00 for the emergency department visit. Relying on this fraudulent representation, the plan agreed that $296.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

i. **Claim No. 9: No. 2018W0007, Date of Service January 16, 2018.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was 99283. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $1,227.00 for the emergency department visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

j. **Claim No. 10: No. 2018W0044. Date of Service April 12, 2018.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99283. However, in fact the appropriate CPT code was 99282. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $998.00 for the emergency department visit. Relying on this fraudulent representation, the plan agreed that $114.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as ACS with a P.O. Box address in Cincinnati, Ohio, was sent to the same RMI address as for claim no. 1, and constituted mail fraud.

k. **Claim No. 11: No. 2010W0457. Date of Service September 8, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99285.

However, in fact the appropriate CPT code was 99284. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $1,158.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $296.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

l. **Claim No. 12:** **No. 2014W0355. Date of Service October 28, 2014.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was 99282. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $776.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

m. **Claim No. 13:** **No. 2014W0417. Date of Service December 29, 2014.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was three levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $776.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

n. **Claim No. 14:** **No. 2015W0019. Date of Service February 15, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99283. However, in fact the appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $520.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $114.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

o. **Claim No. 15**: **No. 2015W0024. Date of Service February 16, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was none at all as with the documentation provided it was unbillable because not properly signed. HCFS therefore submitted a CPT code that was fraudulent. Based on the fraudulent CPT code, HCFS demanded payment of $776.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS coded the claim properly it would have submitted no bill and there would have been no amount paid. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

p. **Claim No. 16**: **No. 2015W0169. Date of Service June 29, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was 99282. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $776.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

q. **Claim No. 17**: **No. 2015W0293. Date of Service November 2, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99283. However, in fact the appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $520.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $114.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

r. **Claim No. 18**: **No. 2015W0325. Date of Service December 4, 2015.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99283. However, in fact the appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $520.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $114.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van

Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

s. **<u>Claim No. 19</u>: No. 2016W0199, Date of Service August 22, 2016.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99284. However, in fact the appropriate CPT code was 99282. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $776.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $173.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

t. **<u>Claim No. 20</u>: No. 2017W0032. Date of Service February 6, 2017.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99283. However, in fact the appropriate CPT code was 99281. HCFS therefore submitted a CPT code that was two levels above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $453.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $114.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

u. **<u>Claim No. 21</u>: No. 2018W0095. Date of Service June 14, 2018.** HCFS coded the claim for billing purposes using fraudulent and inflated CPT code 99285. However, in fact the appropriate CPT code was 99284. HCFS therefore submitted a CPT code that was one level above what it should have been. Based on the inflated CPT code, HCFS demanded payment of $1,010.00 for the ED visit. Relying on this fraudulent representation, the plan agreed that $296.00 should be paid by the plan under the applicable workers' compensation schedule of benefits. In fact, had HCFS submitted the proper CPT code, the amount paid would have been lower. The claim was billed using a claim form identifying the billing provider as Van Meter with a P.O. Box address in Cincinnati, Ohio, was sent to RMI in Baton Rouge LA, and constituted mail fraud.

85.     In each of the above-listed claims, TeamHealth, near the time of the specified date of service, transmitted a bill across state lines to RMI, as an overt act, undertaken with a deliberate intent to deceive, as a part of Defendants' uniform improper billing and coding operations.

86. Each one of these bills included and reflected an unlawfully inflated charge amount based upon the above-alleged use of the wrong CPT code.

87. The evidence of pattern and practice derived from the subject claims is corroborated by similar allegations and evidence adduced in one or more other pending or prior lawsuits brought against TeamHealth entities as alleged hereinabove.

88. The charges TeamHealth sets in its initial bills bear no real relation to the Enterprise's actual costs. They are vastly and arbitrarily inflated. Thus, the fact that in Plaintiff's exemplar claims, the initial TeamHealth charge was many times higher than the amount Plaintiff agreed to pay does not reflect anything more than the absurdly inflated nature of these charges.[22]

89. Information released during prior litigation[23] between TeamHealth and yet another disaffected insurance company reflected that two TeamHealth local practice entities in Texas billed 7.7 times more than their actual costs of paying for clinicians and support services. The bulk of the charges were discounted or written off. About 10% of the money actually collected went to corporate profits.[24] In short, TeamHealth's charges are set at levels absurdly far above both the actual cost to the enterprise to provide the services, but also far above what Defendants reasonably can predict that they will collect.

90. Thus, the write-downs or bill reductions seen in the exemplar claims discussed herein do not reflect Plaintiff shortchanging Defendants, but rather, Plaintiff having to put in unnecessary time and work processing the bills in order to determine what a reasonable price is, given as the bill arrives with a charge set by TeamHealth at an arbitrary and vastly inflated price.

---

[22] *See* Isaac Arnsdorf, How Rich Investors, Not Doctors, Profit from Marking Up ER Bills, ProPublica, June 12, 2020, available at https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed April 2, 2022) ("Arnsdorf 2020").

[23] *ACS Primary Care Physicians Southwest, P.A. v. Molina Healthcare, Inc*., No. 2017-77084 (In the District Court of Harris County, Texas).

[24] Arnsdorf 2020.

91.     In a deposition taken in a prior dispute between TeamHealth and an insurance company called Molina Healthcare, Kent Bristow, a TeamHealth executive, admitted that the actual costs of medical services were not a factor in setting TeamHealth's prices, and that the prices could be higher than up to 95% of other providers and eight or nine times more than what Medicare would pay.[25]

92.     Further, discovery in that case reflected the vastly inflated nature of the charges billed by TeamHealth in other ways.  For a relevant set of claims, it was determined that most of the charges billed by the two TeamHealth local practice affiliates were never actually collected, according to their tax returns and a deposition of the accountant who prepared them.  For the years 2016 and 2017, the two affiliates billed a combined $1.9 billion, but $1.1 billion, or 58%, was discounted according to negotiated deals with insurers. An additional $528 million was written off as bad debt.  The combined revenue that the two affiliates actually received for the two-year period in question was $274.5 million, or about 14% of the amount initially billed.[26]

93.     Like the insurance company involved in the *Molina Healthcare* case, Plaintiff LMRMA's self-funded plan herein does not have a special contract with TeamHealth to set negotiated rates.  Thus, the rates TeamHealth charges in its bills to Plaintiff reflect TeamHealth's fully inflated charges absent any control via contractually negotiated rates.

c.     **Additional facts regarding TeamHealth corporate structure.**

94.     In order to comply with laws restricting the corporate practice of medicine, TeamHealth seeks to establish a purported independence for the numerous local medical practices.  In order to comply with state laws, these practices on their face appear to be independent

---

[25] Arnsdorf 2020.
[26] Arnsdorf 2020.

professional associations, or PAs, owned by doctors or other individuals. Various state laws in this regard require the PA to be owned by a licensed physician.

95.     The PA then contracts with TeamHealth subsidiaries for administrative services, such as coding and billing, in exchange for payment. In truth, however, these PAs are not independent but are controlled with their practice, coding, and billing activities coordinated by the enterprise like a cartel. They are often nominally owned by a physician who also just happens to be an executive at TeamHealth. For the two PAs involved in the *Molina Healthcare* case, when a new executive took over as owner in 2019, he said in a deposition that he could not even remember how he "bought" the entities or if he ever paid anyone the $2 nominal price of their shares.[27]

96.     This unusual business structure has been criticized by private litigants as well as scholarly commentators as being a "sham."[28] Nor can Defendants hide behind it to claim that the RICO "person" and "enterprise" are co-identical so as to avoid liability.

97.     By its dictionary definition, a "cartel" is "an association of manufacturers or suppliers with the purpose of maintaining prices at a high level and restricting competition."[29] Defendants' use of numerous separately incorporated physician group entities, under the circumstances, is cartel-like behavior.

98.     Under RICO as applied in the civil context, in the typical factual paradigm, an otherwise legitimate and productive business is infiltrated by corrupt and quasi-criminal practices for which one or more liable persons are responsible, working through an association-in-fact to advance an enterprise which is not simply co-identical to a corporation working through a normal structure to engage in commerce. Here, each named Defendant was such a liable person under

---

[27] Arnsdorf 2020.
[28] Arnsdorf 2020.
[29] Google's English dictionary, provided by Oxford Languages.

RICO; they engaged in an association-in-fact as alleged herein; and they have imposed their Enterprise that is not co-identical to a normal corporate structure. Rather, the Enterprise involves the calibrated use of numerous nominally independent and separate local physician practices, each of which is legitimate and serves a productive and lawful purpose of providing needed medical care, and which for purposes of the relevant examples provided above, involved the use of the ACS entity.

99. In this matter, ACS, Van Meter, and the other practice groups constitute numerous small regional and local medical and physician practices across the country. Some are self-standing. Others may be a part of networks. Some may be branches of a single larger business.

100. What is less well known is that numerous of what facially appear to be small separate independent physician practices, with differing NPI numbers,[30] that are spread throughout the country, are actually all members of the TeamHealth enterprise following uniform rules and procedures emanating from Team Health Holdings and Ameriteam. These rules and procedures oblige the local practice entities to direct all of their medical coding and billing through a single bottleneck entity – HCFS – as the point of interface between TeamHealth and its doctors on the one hand, and TeamHealth and its payors on the other.

101. During the pertinent times, HCFS coded and submitted claims to insurers and claims administrators pursuant to policies set by Team Health Holdings and Ameriteam. TeamHealth, including through HCFS, employs a dedicated staff that prepares and submits insurance claims based ostensibly on medical records received from physicians. On information

---

[30] The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard. NPI numbers are a unique identification number for covered health care providers. See www.CMS.gov.

and belief, many of these individuals are not certified professional coders, but rather depend on HCFS, Team Health Holdings or Ameriteam for their training regarding the use of CPT codes.

102.    Medical coding requires training to identify the appropriate CPT codes to ensure appropriate and accurate billing.  Certified professional coders must undergo extensive training and certification to ensure that they make justified coding decisions.  The extent to which TeamHealth opts not to use certified professional coders corroborates TeamHealth's focus on maximization of revenue rather than compliance.

103.    The rate at which TeamHealth submitted claims to Plaintiff and to others under its pattern and practice of improperly utilizing higher CPT codes including 99284 and 99285 was significant to the point that TeamHealth's own failure to identify, control, and end it reflects intentional misconduct or recklessness on TeamHealth's part particularly in light of TeamHealth's copious representations and assurances of ethical and legal compliance and close control over its coders made on its website.

104.    TeamHealth's error rate for relevant categories of claims greatly exceeded any acceptable error rate for providers of emergency services for such claims. The degree to which claims obviously warranted lower CPT codes upon review forecloses the possibility that the upcoding occurred by mistake.  The degree and consistency of TeamHealth's upcoding of claims utilizing CPT codes 99284 and 99285 demonstrates that TeamHealth has a uniform policy or practice of upcoding such claims.

105.    During the pertinent times, TeamHealth used the coding and billing services of HCFS as a recruiting tool with physicians.  TeamHealth marketed the entity publicly as follows, encouraging physicians to rely on its asserted coding and billing expertise, and indicating that this would grow revenue:

With today's tightening regulations, striking a balance between maintaining compliance and <u>appropriately charging for your health care services has become an arduous task</u>. Poor documentation of your patient records may not only mean lost revenue—it places your practice in danger of fines or worse. The complex nature of emergency medicine only serves to complicate matters even further.

As an integral part of <u>our billing services, HCFS of TeamHealth provides expert medical coding performed by seasoned, trained professionals</u>. By staying abreast of state and federal guidelines as well as third-party payer coding rules, <u>we help you reduce revenue loss</u> while remaining compliant. HCFS of TeamHealth also offers regular workshops designed to help educate your providers and improve their documentation skills.

From teaching you and your colleagues how to properly document patient encounters to <u>correctly coding each medical record and performing random audits</u>, we are dedicated to helping you bridge the gap between compliance <u>and revenue</u>.

(Emphasis added).

106.    Based on those and similar representations that were made orally and by other means to them, practicing TeamHealth doctors and nurses at TeamHealth-staffed EDs justifiably relied on TeamHealth to properly and lawfully provide all billing, coding, and compliance services.

107.    TeamHealth's coding and billing entity exists to serve as the centralized coding and billing point for all TeamHealth's numerous local physician practices that it indirectly but ultimately owns, in addition to any services the entity provides to non-Team Health medical providers regarding their billing and coding needs.

108.    In marketing itself as having special expertise in billing and coding, TeamHealth acknowledges that it involves special knowledge and expertise for an individual professional coder to go through and determine or check on the CPT code for a particular claim. TeamHealth exploits the combined facts that a) automated claims processing depends on CPT codes being accurate and pays levels based on codes, and b) automated processes do not "go behind" CPT codes to review

supporting documentation by having an expert manually check whether in fact the medical records justify the assigned level of CPT coding.

109.    For some self-funded plan administrators or service organizations, the process is automated. *Hernandez*, Complaint ¶ 34.  Because it is automated, the computer system depends blindly upon the electronic CPT code embedded in the generic Form CMS-1500 that is processed and paid by an automated means with little human involvement.  TeamHealth banks on this system to conceal the fraud caused by the overbilling via inflated CPT codes.

110.    The above-referenced set of hundreds of physician provider entities, which are nominally separately organized or incorporated, stand alone and independent from one another, are actually, under the accepted definition, a cartel, in the sense that they are organized so as to extract higher revenues (via overbilling) as a unitary enterprise.

111.    In fact, this group of entities dissolves upon examination from presenting as a group of separate physician practices spread around the country and associated with particular hospital EDs, into being in reality and in the eyes of the law a single RICO enterprise.

112.    TeamHealth recruits doctors and ACPs by promising to lift the administrative burden of being a practicing professional off their shoulders.[31]  The natural desire of physicians is generally to provide the care to the patients and fulfill their Hippocratic Oath, not to learn how to correctly code and bill Medicare or other payors.

113.    TeamHealth promises to doctors to provide great expertise and skill in all aspects of medical practice coding, billing, collections, and compliance.  With regard to billing, the HCFS

---

[31]  See website,  https://www.teamhealth.com/what-we-do/emergency-medicine/?r=1,  professing how doctors associating with TeamHealth will receive the benefit of TeamHealth "increasing your administrative support."

website promises medical providers and provider groups that it will not only take over all their billing but also, will make them more money than otherwise:

> Through our full-service revenue cycle management services, HCFS of TeamHealth helps you ease your administrative burden, speed reimbursement and keep days in accounts receivable well below average. We also provide expert guidance designed to help you gain more control over your managed care contracts and optimize your revenue.

> Our Comprehensive Billing Services Include:
> * Helping you set an appropriate fee schedule
> * Evaluating your existing managed care contracts for efficiency
> * Negotiating favorable payment rates with managed care payers
> * Correctly enrolling your physicians and mid-level providers with third-party payers
> * Performing daily audits to account for all of your billable patient charts
> * Correctly coding all billable medical records
> * Maintaining stringent HIPAA and coding compliance
> * Collecting deductibles and co-payments from your patients, including "self-pay" patients
> * Getting your insurance claims and patient bills and statements out quickly and accurately, using electronic delivery whenever possible
> * Researching and handling all refunds
> * Correctly depositing funds into your group's bank account
> * Providing a National Patient Service Center to manage billing inquiries from your patients and payers

> **Our Diligent Collections[32] Process**

> HCFS of TeamHealth has put together dedicated claims denial teams that respond quickly when your claims are denied, underpaid or ignored. HCFS of TeamHealth billing centers utilize advanced technologies such as electronic skip tracing and electronic insurance verification systems to locate hard-to-find patients and identify insurance coverage more quickly in the revenue cycle.

> **Let Our Experience Work for You**

> Boasting the largest emergency physician billing operation in the United States, HCFS of TeamHealth submits approximately 7 million insurance claims and processes invoices for more than 8.6 million patients annually on behalf of our clients. Our billing services are backed by expertise, support and advanced

---

[32] Rather than write off amounts owed by low-income patients like other providers, TeamHealth has filed lawsuits. On information and belief, TeamHealth filed 4,800 lawsuits in Tennessee between 2017 and 2019 alone.

technologies. <u>Many of our clients experience a dramatic increase in their income as a result of utilizing our services.</u>

(Emphasis added).  Thus, TeamHealth markets a unitary set of billing and collection practices engaged in by "HCFS of TeamHealth billing centers."

114.    Finally, with regard to compliance, the website touts that TeamHealth has "expertise in medical coding guidelines" uses "a rigorous, standards-based coding methodology," engages in "[r]outinely auditing each coding staff member's work on pre-billed records," so that clients can reach the goal of "optimizing growth and stemming revenue loss."

115.    The polarity as between TeamHealth and its doctors is reflected by the fact that in multiple class actions its own doctors have sued alleging that TeamHealth had failed to share with them certain patient billing revenues known as resident value units ("RVUs").  That litigation led to a class-wide order of preliminary approval dated in the matter of *Forward Momentum, LLC v. Team Health, Inc*., No. 2:17-cv-00346-WKW-JTA (N.D. Ala. March 11, 2022).[33]

116.    Furthermore, in its press releases and investor disclosures, Team Health Holdings routinely insists that it does not materially control its medical providers.  Rather, it insists that "[a]ll such providers exercise independent clinical judgment when providing patient care. Team Health Holdings, Inc. does not have any employees, does not contract with providers and does not practice medicine."[34]  Likewise, on its website TeamHealth describes that "TeamHealth does not

---

[33] (order preliminarily approving a settlement in the amount of $15 million; this constituted a fund to pay back the doctors some of the RVU monies); *see also Sanchez v. Team Health, LLC*, No. 18-21174-CIV-MARTINEZ-OTAZO-REYES, 2021 U.S. Dist. LEXIS 64213, 2021 WL 4990803 (S.D. Fla. March 31, 2021) (in which plaintiff TeamHealth doctors sued TeamHealth alleging the company was not sharing RVU relative value unit payments with its doctors; in this order, the court dismissed the claims in part); *JMF Med., LLC v. Team Health, LLC,* 490 F. Supp. 3d 947 (M.D. La. Sept. 29, 2020) (similar resident value unit RVU allegations).

[34] *See, e.g*., TeamHealth/Blackstone press release, "TeamHealth to be Acquired by Blackstone," available at https://www.teamhealth.com/news-and-resources/press-release/teamhealth-to-be-acquired-by-blackstone/ (last accessed March 29, 2022).

contract with physicians to perform medical services nor does it practice medicine in any way and nothing in this website is intended to convey any different practice."[35]

117.    Plaintiff brings no claims herein against the TeamHealth physicians or ACPs. Rather, Plaintiff recognizes the fact that the physicians and ACPs who are out practicing in the field at the various TeamHealth-staffed hospital ED locations, are effectively removed, insulated, and siloed away from all matters related to billing and coding including the material facts and transactions herein.

118.    In the *Celtic Ins. Co.* matter, Celtic alleged that based on its expert's analysis of TeamHealth ED charts, a sample of 29 charts dated between 2015 and 2018 reflected that 18 of the 29 medical records did not support the CPT code that appeared on the medical bill.  The 18 medical bills that were "upcoded" represented 62% of the medical bills reviewed containing CPT code 99285.  A later survey of 10,000 bills dating from 2019-2020 reflected that Team Health upcoded nearly two-thirds of bills that were analyzed.[36]

119.    Likewise, in the *United Healthcare* matter, the United plaintiffs alleged that they had reviewed 47,000 charts supporting commercial health benefits claims submitted by TeamHealth and determined that 75% of the claims TeamHealth submitted to United using the 99285 CPT code for ED visits should have utilized lower-level CPT codes.  United Healthcare gave examples from 2019 to 2021.[37]

120.    It begs credulity to conclude that over recent years TeamHealth was billing Celtic and United Healthcare overcharges between 62% and 75% of the time on CPT code level 5 bills, while **not** doing the same with regard to the LMRMA Plan.  TeamHealth used common policies

---

[35] This content is available at https://www.teamhealth.com/our-company/human-resources/terms-and-conditions/?r=1 (last accessed March 29, 2022).
[36] *Celtic Ins.* complaint ¶¶ 12, 63, 65 & Exs. 1-2.
[37] *United Healthcare* complaint ¶¶ 72-86.

and procedures and coding and billing facilities during this time. All charts were coded by the same group of TeamHealth workers overseen by the "HCFS Billing Center" and common corporate management personnel.

121.    Anonymous workplace reviews provided at online sites like Indeed.com by self-identified TeamHealth employees further attest to the fact of TeamHealth using common practices at centralized billing facilities – practices conducive to rampant upcoding. For example, a review by a person identified as a "Hospital Medicine Coder (Current Employee)" in "Louisville, TN" dated March 26, 2019 described in part:

> This company has a LOT of division between departments and management. It's a cubical nightmare that makes you feel like a lab rat. They have impossibly high coding standards with coding rules (not AAPC guidelines) changing daily and you have to keep up. It is very difficult to do and the education is poor (they think it's great-it isn't). Everything correlates to the P&P, a huge binder of ever changing coding rules. The way things are written it is very easy to interpret incorrectly. There is a very high turnover rate due to this. They closely monitor your productivity and work quality, which is a great thing except that the way they do it is terrifying. Everyone is in constant fear of their job. You are monitored in all aspects of your work and personal time at work. Don't take too long in the bathroom. Don't slouch too much at your desk. No noise at all. Don't eat anything that prevents you from being able to type at your desk. It's like a sweat shop. **Their coding cheats the system and you will almost always bill the highest possible level of care.**

(Emphasis added).

122.    As another example, a review by a person identified as a "Coder (Former Employee)" in "Buffalo, NY" dated June 16, 2015 described in part:

> No communication at all. Coders feel hopeless. Unreasonable goals without the tools to achieve them. Software systems always going down. Coding supervisor doesn't have management experience, not polite. Headquarters are very slow with response and action. Mandatory OT of less than 24 hrs notice. No advancement. Company wants you to fail. No uplifting. No positive feedback. Constant threats with your job security. Lack of training. Some aspects of coding do not follow CMS or AMA guidelines. **Lots of up coding** and constant duplicate claim submissions for same date of service which results in duplicate payments but no refunds.

(Emphasis added).

## V.    CLASS ACTION ALLEGATIONS.

123.    Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as well as Rule 23(c)(4) in the alternative, as representative of a class defined as follows:

a.   **RICO Class:**  All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories during the four years[38] prior to the filing of the Complaint in this action.

b.   **Unjust Enrichment Class:**  All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories during the three years prior to the filing of the Complaint in this action.

c.   **Declaratory Judgment Class:**  All payors or their assignees that compensated TeamHealth or an entity billing on its behalf for medical treatment in the United States or its territories at any time prior to the filing of the Complaint in this action.

d.   United States governmental programs including Medicare, Medicaid, and Tricare are excluded as class members.

124.    Members of the class are so numerous and geographically dispersed that joinder of all is impracticable. TeamHealth enters into agreements with and bills services to numerous self-funded plans and other payors throughout the nation and in conjunction with those medical coverage plans provides medical services to numerous patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable.  Numerosity is apparent.[39]

---

[38] The alleging of this damages period is not intended to waive Plaintiff's right to contend that to the extent any limitations periods may apply to the claims, those limitations periods were tolled during the period before the Plaintiff uncovered the revelations regarding systematic upcoding. Until that point, Plaintiff lacked knowledge of the fact that TeamHealth had deliberately and systematically deceived them by sending inflated claims for ED services.

[39] "According to the data, among all firms the percentage of employees covered by self-funded plans had increased from 44 percent in 1999 to a record high of 67 percent in 2020 before decreasing slightly to 64 percent in 2021. Self-funded plans are those in which companies choose to pay for some or all of the health services of their workers directly rather than purchasing health insurance for them."  Statista website, at https://www.statista.com/statistics/985324/self-funded-health-insurance-covered-workers/ (last accessed March 17, 2022).  Further, "[i]n recent years, a complex funding option, often called level-funding, has become more widely available to small employers. Level-funded

125.     The class is readily identifiable from information and records in the possession of TeamHealth.  Further, Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and all members of the class were damaged by the same wrongful conduct, i.e., Plaintiff's assignors and the plan herein and all members of the class had enrollees who received treatment from a TeamHealth staffer and were billed artificially inflated prices for the services received.

126.     Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the class.  Class counsel representing Plaintiff are experienced in class action litigation.

127.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members, here as in other analogous matters in which self-funded plans made up a putative class.[40] Further, TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate or supporting the remedy of injunctive and equitable relief.

128.     Questions of law and fact common to the class include, but are not limited to:

a.   Whether all or some of Defendants are liable persons under RICO.

b.   Whether Team Health Holdings, Ameriteam, and HCFS engaged in an association-in-fact under RICO.

c.   Whether Team Health Holdings, Ameriteam, and HCFS during the pertinent times through a RICO enterprise committed repeated predicate offenses of mail or wire fraud sufficient to ground a RICO claim.

d.   Whether TeamHealth engaged in one or more systematic and uniform unlawful schemes or courses of conduct by "upcoding" and billing prices above lawful and proper amounts and rates;

arrangements are nominally self-funded options that package together a self-funded plan with extensive stoploss coverage that significantly reduces the risk retained by the employer. Sixteen percent of covered workers in small firms (3-199 workers) are in a level-funded plan."  Kaiser Family Foundation, https://www.kff.org/report-section/ehbs-2020-section-10-plan-funding/ (last accessed March 21, 2022).
[40] *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000-RDP (N.D. Ala.), preliminary approval order, Doc. 2641 filed Nov. 30, 2020, p. 57 (certifying *inter alia* class of self-funded plans in antitrust action).

e.  Whether TeamHealth, during the pertinent times, sent inflated bills for services to Plaintiff and class members;

f.  Whether the TeamHealth enterprise acted under a common purpose of profiting from inflated billing;

g.  Whether TeamHealth engaged in a pattern and practice of deceptive or fraudulent activity intended to defraud or deceive Plaintiff and class members;

h.  Whether the various TeamHealth Defendants are jointly and severally liable due to their own direct involvement or under the instrumentality rule, for purposes of the alternative unjust enrichment claim;

i.  Whether Defendants violated RICO;

j.  Whether Defendants are liable to Plaintiff and the class members for damages flowing from Defendants' misconduct, under RICO;

k.  Whether Plaintiff and its assignors and class members have conferred benefits on TeamHealth such that they are entitled to restitution for payments above the quantum meruit value of TeamHealth's services, under a claim for unjust enrichment; and

l.  Whether equitable, declaratory or injunctive relief is warranted.

129.  Plaintiff and its assignors and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct.

130.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated and commonly affected self-funded plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

131.  Certification of an opt-out class effectuated via the sending and publication of a duly authorized class notice may be optimal in this case given the likelihood that some of the putative class members may have already had their individual claims effectively resolved by virtue

of resolutions of relevant actions or by non-public settlements, or who may individually already actively be pursuing such claims now, and therefore, who may desire to opt out.

132.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

133.    Additionally, TeamHealth has acted and failed to act on grounds generally applicable to Plaintiff and its assignors and the class and that in the Court's discretion would warrant imposition of uniform relief to ensure compatible standards of conduct toward the class are met, thereby making equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2) an appropriate remedy.

134.    Alternatively, Plaintiff is entitled under Rule 23(c)(4) to the certification of a class with respect to one or more particular issues herein.

135.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## COUNT I
## RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT

136.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 135 as if fully set forth herein.

137.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

138.    RICO also provides: "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

139.    Plaintiffs are "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) & 1964(c).

140.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

141.    Defendants' relevant activities herein significantly affected interstate commerce. With regard to the specific nine out of eleven examples of false claims alleged hereinabove, during the pertinent times the Defendants engaged in interstate commerce activities including the performance of services by TeamHealth staff personnel at the relevant hospital ED in Louisiana; transmittal of records and data from Louisiana to TeamHealth offices including in Knoxville, Tennessee; performance of coding and billing activities by HCFS; and transmittal of bills from TeamHealth to the Plaintiff.

142.    A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

143.    For purposes of this Complaint, the relevant Enterprise is an association-in-fact, consisting of: (a) Team Health Holdings; (b) TeamHealth's subsidiaries, including specifically Ameriteam; and (c) the nominally independent and separate individual professional corporations and other legal entities that employ or contract with the individual professional healthcare contractors or employees whose services TeamHealth sells, and which TeamHealth either indirectly owns through its regional subsidiaries or controls de facto.

144.    Defendants have an existence separate and distinct from the Enterprise, in addition to directly participating in and acting as a part of the Enterprise.  For example, TeamHealth markets HCFS to provide coding and billing services as a vendor to third parties, in addition to its work on behalf of TeamHealth-controlled local physician and midlevel provider groups stationed at numerous hospital EDs.

145.    Although the various components of the Enterprise play different roles, they all serve a common purpose: allowing TeamHealth to submit upcoded health insurance claims to payors, and to keep the difference between the amount received as a result of the upcoded claim, and the amount that would have been received had the claim been properly coded.

146.    The front-line healthcare workers employed as employees or as independent contractors by TeamHealth's corporate subsidiaries or de facto controlled affiliates provide medical services to patients in emergency rooms, aka, hospital EDs.

147. TeamHealth's numerous subsidiaries and affiliates have a mixture of corporate ownership structures. Some of TeamHealth's affiliates are wholly owned by TeamHealth; others are partially owned by TeamHealth; and some are wholly owned by others.

148. Without these corporations and the healthcare contractors who provide services, the Enterprise would have nothing to upcode. Defendants' regional subsidiaries oversee the entities employing or contracting with healthcare contractors, and they negotiate contracts with hospitals. Without the regional local practice entities and the hospitals through which they deploy their healthcare workers, the healthcare workers would have no patients to service, and TeamHealth's ability to efficiently coordinate and direct the activities of the entities employing the healthcare workers would be diminished.

149. Defendants acting through their association-in-fact coordinate the Enterprise; perform the upcoding; employ the staff that receives medical records from TeamHealth's healthcare staffers stationed at various EDs; and apply CPT codes to those records in accordance with policies dictated by HCFS, Ameriteam, or Team Health Holdings.

150. Each participant in the Enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the Enterprise's goals. Team Health Holdings and Ameriteam set policies requiring or encouraging the falsification of claims as explained hereinabove. HCFS carried out those policies by systematically submitting false and misleading claims to Plaintiff and class members for ED services. The various medical groups affiliated with TeamHealth supplied medical services to provide the basis for upcoded claims, here, through the local Louisiana-organized entities, ACS and Van Meter, among others.

50

151.    The organization of the Enterprise, and specifically its use of subsidiaries and purported nominally autonomous independent contractors rather than direct employment of healthcare contractors, facilitates the Enterprise's upcoding scheme in two ways.

152.    First, if TeamHealth directly employed all the healthcare workers controlled by it, or if it directly owned all the corporate practice groups that provide services on its behalf, TeamHealth would violate various state laws prohibiting the corporate practice of medicine.   The Enterprise's structure is therefore essential to its functioning and to its ability to control and profit from healthcare providers who, at the same time, appear to patients, the public, and to unwitting bill recipients to be independent.

153.    Second, by operating through subsidiaries and other entities that have other names, TeamHealth creates an impression that patients have received services from a local doctors' group, as opposed to a sophisticated national enterprise that has repeatedly been sued for billing abuse among other practices.

154.    To this end, TeamHealth almost never bills patients or insurance companies under its own name. This creates the illusion that its healthcare physicians and midlevels are providing care that is locally owned and directed. This illusion disguises the truth and makes TeamHealth's fraud more difficult to detect, because TeamHealth submits upcoded and inflated health insurance claims under the names of dozens of different corporate entities, with no indication that they are affiliated with TeamHealth.

155.    This illusion helps protect TeamHealth politically and to insulate its activities, including by avoiding public scrutiny of the numerous claims it has made and lawsuits it has filed under various corporate names against individuals and insurance companies in efforts to collect on inflated bills.

156.    As the topmost corporate entity of what it calls the "TeamHealth system," TeamHealth conducts and directs the Enterprise and sets policies that govern the functioning of all components of it. TeamHealth is responsible for the actual upcoding, which occurs after its healthcare contractors submit medical records that document the actual services provided to the patient. TeamHealth uses those medical records and improperly exaggerates the services they reflect, consistent with TeamHealth's procedures, in order to submit "upcoded" health insurance claims to insurance companies and other payors.

157.    RICO prohibits the conduct of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering acts are defined at 18 U.S.C. § 1961(1) and include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

158.    TeamHealth, through its Enterprise, committed numerous acts of mail fraud and wire fraud. Specifically, TeamHealth conducted a scheme to defraud insurers and self-funded plans with specific intent to obtain money from them by materially false and fraudulent representations, and to use the mails and interstate wires in furtherance of the scheme, including via its medical billing practices.

159.    Central to TeamHealth's scheme to defraud is the systematic upcoding of medical services provided to insured patients by healthcare contractors that are under TeamHealth's control. TeamHealth's upcoding scheme misrepresents the nature of the services provided to Plaintiff's enrollees, for the purpose of recovering more money from Plaintiff and patients.

160.    Because payors like Plaintiff are generally not provided with the underlying medical records that form the basis of TeamHealth's health insurance claims, and because of the massive volume of health insurance claims, in the normal course of business, they rely on TeamHealth's representations regarding the nature of the services.

161.     TeamHealth's scheme has been carried out with the specific intent to defraud Plaintiff and others who are similarly situated. The evidence indicates that TeamHealth has submitted a large proportion of health insurance claims to Plaintiff and others who are similarly situated under the highest CPT codes for services by its healthcare contractors, improperly thereby rendering those claims false.

162.     Instances of upcoding in TeamHealth's health insurance claims are not mere isolated incidents, but instead are part of a pattern and practice of upcoding intended to increase TeamHealth's revenue and profits.

163.     The fact that TeamHealth's coding is conducted at a centralized location, under the oversight of TeamHealth management, further demonstrates that TeamHealth's numerous upcoded health insurance claims are not a matter of mere coincidence.

164.     TeamHealth has used the mails and interstate wires in furtherance of its upcoding scheme to defraud Plaintiff and others who are similarly situated in a number of ways, including:

    a.  Mail and wire receipt of medical records sent from TeamHealth-affiliated hospital ED groups located throughout the country to TeamHealth's centralized coding operations facility in Tennessee;

    b.  Mail and wire transmission of fraudulently upcoded health insurance claims from TeamHealth's Tennessee offices to self-funded plans, including Plaintiff and class members, in numerous states throughout the country;

    c.  Mail and wire transmission of marketing materials to hospitals in order to sell TeamHealth's staffing services and expand the scope of the enterprise;

    d.  Mail and wire receipt of money from Plaintiff, and class members embracing other TPAs and self-funded plans, in various states, representing the unlawful proceeds of TeamHealth's upcoding scheme; and

    e.  Mail and wire communications between TeamHealth and its regional subsidiaries and provider groups in various states, by which TeamHealth promulgates policies and procedures and directs conduct with a goal of maximizing billing.

165. TeamHealth's repeated acts of racketeering activity form a "pattern" under RICO because they occurred within ten years of each other, were continuous, and are related. Through its many mailings and wire communications in furtherance of its scheme to defraud, TeamHealth has committed numerous acts of racketeering activity.

166. These acts are part of a common scheme and have the same purpose: to extract greater payments from payors than TeamHealth is entitled to.

167. TeamHealth has adopted policies encouraging upcoding, and has a regular staff dedicated to coding that is trained to adhere to TeamHealth's practice of upcoding on a systematic basis. Upcoding is part of TeamHealth's regular way of doing business, and absent judicial intervention, TeamHealth will continue its upcoding scheme for as long as it remains profitable.

168. Each participant in the Enterprise, and in particular Team Health Holdings, Ameriteam, and HCFS, knew their scheme violated federal and state laws, and acted with the specific intent to defraud Plaintiff and other payors.

169. The Enterprise engaged in and affected interstate commerce because, among other things, Defendants operated emergency rooms nationwide in to support its scheme, accounting for 17% of the emergency services market in the United States.

170. Predicate acts of racketeering that Team Health Holdings, Ameriteam and HCFS engaged in include, but are not limited to: (a) the use of wires and mails to submit fraudulent claims to Plaintiff and other payors; (b) the use of wires and mails to coordinate the unlawful activities of the enterprise, including the dissemination of relevant policies and the transmission of medical records from medical groups to coding staff; and (c) the use of the wires and mails to obtain payments from Plaintiff, and to distribute the proceeds of the scheme amongst its members.

Plaintiff has above alleged specific and representative examples of the fraudulent insurance claims the Enterprise submitted to Plaintiff using the wires and mails.

171. TeamHealth's upcoding scheme has directly caused injury to Plaintiff's business and property. Plaintiff suffers injury each time the plan pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided or required.

172. Plaintiff's injury and damages consists of the difference between the amount that Plaintiff and its assignors paid TeamHealth on upcoded health insurance claims and the amount that they would have paid had the underlying medical services had been properly coded and billed.

173. By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage Plaintiff sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

174. Plaintiff also seeks equitable and injunctive relief including to require TeamHealth prospectively to alter its current policies that require, encourage, and incentivize upcoding, retrain its coding staff to properly code medical records rather than systematically upcode them during billing, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

## COUNT II
## CONSPIRACY TO VIOLATE RICO

175. Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 174 as if fully set forth herein.

176. Defendants, collectively referred to as TeamHealth, agreed with each other to pursue the schemes described above, namely, upcoding and falsely billing services provided by

physician's assistants as though they were performed by a doctor, with the ultimate objective of realizing increased revenue and profits. Although Plaintiff LMRMA only learned of this conspiracy recently, it began years ago.

177. Each of Defendants took overt acts in furtherance of the conspiracy, namely, promulgating policies that required TeamHealth employee responsible for coding insurance claims to upcode those claims; shielding the upcoding conduct from visibility to TeamHealth's own physicians and midlevel providers; aggressively billing payors on the inflated claims; and aggressively engaging in collection and litigation on its bills.

178. Defendants knew that their policies would lead to a pattern and practice of submitting false and inflated claims to Plaintiff and others similarly situated, for the purpose of obtaining money from those payors by inciting them to rely on and pay based on materially false and fraudulent representations, all through the use of the mail and interstate wire transmittals within the meaning of RICO, in furtherance of the scheme.

179. TeamHealth's upcoding scheme has directly caused injury to Plaintiff, who suffers injury each time the Plan pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided.

180. Plaintiff's damages consist of the difference between the amount that they actually paid TeamHealth on each upcoded health insurance claim and the amount that they would have paid if the underlying medical services had been properly coded and paid.

181. By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Plaintiff for three times the damage that Plaintiff and the class sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

182.     Plaintiff also seeks equitable and injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcoding medical records, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue.

**COUNT III**
**UNJUST ENRICHMENT**

183.     Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 182 as if fully set forth herein.

184.     Plaintiff and its assignors have repeatedly conferred benefits on TeamHealth, namely, in the form of making payments for services purportedly rendered by TeamHealth to Plaintiff's health care coverage enrollees.

185.     During the pertinent times, TeamHealth received and appreciated those benefits; it was aware that Plaintiff was making payments to it for services purportedly rendered.

186.     Retention of these conferred benefits by TeamHealth without adequate compensation would be unjust and inequitable under the circumstances because the amount of the payment materially exceeded the value of the service for which the billing was sent, namely, provision of medical services to Plaintiff's enrollees.

187.     Plaintiff and its assignors are not in contractual privity with TeamHealth. There is therefore no means for Plaintiff to secure contractual recovery of the benefits it has conferred on TeamHealth.

188.     Furthermore, all similarly situated class member payors are likewise entitled to restitution or damages as a result of TeamHealth's unjust enrichment.

## COUNT IV
## EQUITABLE, DECLARATORY, INJUNCTIVE RELIEF

189.     Plaintiff incorporates by reference the allegations in each of the preceding paragraphs 1 through 188 as if fully set forth herein.

190.     Under the facts presented, it would be appropriate for this Court to award interim or ultimate declaratory, injunctive and equitable relief or remedies in this matter, including:

a.  Enter declaratory, equitable, and injunctive relief requiring Defendants to alter current policies regarding upcoding, retrain coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

b.  Appointment of a special master to preside over discovery and data sampling issues as may be necessary;

c.  An order of reformation of Defendants' policies and practices that have combined to create numerous instances of fraudulent overbilling; and/or

d.  An order of disgorgement, restitution and for recoupment of all overpayments improperly obtained by Defendants at any time since the first commencement of their overbilling scheme.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial of all issues properly triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Certify the matter as a class action;

2. Appoint Plaintiff as the class representative and appoint the undersigned counsel to be class co-counsel herein;

3. Enter judgment in favor of Plaintiff on all counts of this Complaint;

4. Award Plaintiff and class members money damages, in an amount to be proven at trial, of at least $5,000,000, including but not limited to any applicable award of treble damages pursuant to RICO, 18 U.S.C. § 1965(c), or as otherwise permitted by law;

5. Enter declaratory, equitable and injunctive relief requiring TeamHealth to disgorge all ill-gotten gains and unjust enrichment monies; and requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular audit of its coding practices by an independent monitor, with all costs to be paid by TeamHealth;

6. Award Plaintiff and class members their costs, expenses, and reasonable attorneys' fees incurred in this action as permitted by law;

7. Award Plaintiff and class members all pre- and post-judgment interest to the maximum extent permitted by law; and

8. Award such other relief as this Court deems just and proper.

Dated: March 29, 2023        **MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

                  By:     /s/Gregory F. Coleman_____
                            Gregory F. Coleman, TN BPR No. 014092
                            Vince Carnevale*
                            800 South Gay Street, Suite 1100
                            Knoxville, TN 37929
                            T: 865-247-0080
                            F: 865-522-0049
                            gcoleman@milberg.com
                            vcarnevale@milberg.com

Andrew A. Lemmon, LA Bar #18302
**LEMMON LAW FIRM, LLC**
Of counsel to Milberg Coleman Bryson
Phillips Grossman, PLLC
5301 Canal Boulevard, Suite A
New Orleans, LA 70124
T: 985-783-6789
andrew@lemmonlawfirm.com
alemmon@milberg.com

Roy Shimon
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
T: 212- 946-9467
rshimon@milberg.com

*Attorneys for Plaintiff*

*\*Motions for pro hac vice admission forthcoming*